IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, | : : : | |
| Plaintiff, | : : | CASE NO. 1:21-cv-01243 |
| v. | : : | |
| MITCHELL FALTER and JESSICA DOLL, | : : | |
| Defendants. | : : | |

**MEMORANDUM OF LAW IN SUPPORT OF
TIAA'S MOTION FOR A PRELIMINARY INJUNCTION**

**A.   PRELIMINARY STATEMENT OF FACTS**

Plaintiff Teachers Insurance and Annuity Association of America ("TIAA") respectfully submits this Memorandum of Law in support of its Motion for a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from violating their non-solicitation and other obligations to TIAA.

The financial services industry is highly competitive. (*See* Declaration of Henry N. Conway, III (hereafter the "Conway Dec.") at ¶ 11). TIAA takes extensive measures to protect its client base and the confidentiality of its client information. (*Id*.).

Falter and Doll commenced their affiliation with TIAA in 2007 and 2014, respectively. (*Id.* at ¶ 3). TIAA paid for Defendants' registrations with various securities exchanges, provided them with accounts to service, and gave Defendants many other benefits throughout their affiliation with the company. (*Id.*). As a result of the many benefits given to them by TIAA, Defendants each serviced TIAA clients investing hundreds of millions of dollars in assets with the company. (*Id.*).

In connection with their ongoing affiliation with TIAA, Defendants signed a Confidentiality and Non-Solicitation Agreement (the "Agreement") containing notice, non-solicitation, confidentiality, and non-disparagement covenants. (*See* Exhibits "A" – "B" to the Complaint). The Agreement also provides: "**EMPLOYEE'S AFFIRMATION OF THOROUGH REVIEW**. EMPLOYEE AFFIRMS THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT, KNOWS AND UNDERSTANDS ITS TERMS, CONDITIONS AND EFFECTIVE DATE, AND HAS HAD THE OPPORTUNITY TO ASK ANY QUESTIONS THAT EMPLOYEE MAY HAVE PRIOR TO SIGNING THIS AGREEMENT." (*Id*.at ¶ 10) (capitalization and bold in the original).

Significantly, Defendants agreed in paragraph 7 that TIAA would be entitled to preliminary injunctive relief upon its breach *or threatened breach*. The Agreement is just a part of TIAA's efforts to maintain the confidentiality of its client information. (*See* Conway Dec. at ¶ 12). Wealth Management Advisors are required to review and acknowledge their agreement to abide by the TIAA Compliance Manual (the "Manual"). (*Id*.). The Manual, like the Agreement, makes clear that confidential information includes, among other things, the identities of TIAA's actual or prospective clients. (*Id*. at ¶ 13). TIAA also limits a Wealth Management Advisor's access to client information only to those clients he/she services, including by assigning passcodes. (*Id*. at ¶ 14). TIAA policy also prohibits Wealth Management Advisors from providing their personal cell phone numbers to clients and, in fact, doing so would allow them to have access to clients' confidential contact information outside of the purview of the firm. (*Id*. at ¶ 15).

Defendants simultaneously gave notice of their resignations on February 26, 2021, effective March 28, 2021.1 (*Id*. at ¶ 16). In spite of their promise not to solicit or attempt to solicit co-employees, Defendants coordinated their departures with that of a third employee, Thomas Massie ("Massie"), who also worked in TIAA's Fairfax, Virginia office. (*Id*. at ¶ 17).

When they gave notice of their resignations, neither Falter nor Doll disclosed where they were going, claiming instead that they were exploring "various options." (*Id*. at ¶ 18). Defendants also gave TIAA no indication they would be working together, or with Massie, at the same competitor. (*Id*. at ¶ 19). On or about April 2, 2021, however, shortly after their 30-day notice periods were over, Defendants, Massie, and a fourth former TIAA employee, Melanie Simons, co-founded a new entity, ReFrame Wealth ("ReFrame"), in Fairfax, Virginia, and now are offering products and services competitive to TIAA. (*Id*. at ¶ 20).

On February 10, 2021, approximately two weeks before he gave notice of his resignation, Falter emailed a TIAA client his personal cell phone number and invited the TIAA client to "call me any time." (*Id*. at ¶ 21). TIAA believes that, when Falter provided the TIAA client with his personal cell number and invited the TIAA client to "call me any time," he knew he would shortly be giving notice of his resignation from TIAA. (*Id*. at ¶ 22).

By correspondence dated March 18, 2021, TIAA raised concerns about Falter's February 10, 2021 email. (*See* Exhibit "C" to the Complaint). In response, Falter's counsel described the situation leading to Falter providing his personal cell phone number to a TIAA client as a "specific circumstance related to a recently widowed client whose late husband also was a client" and that it "was merely intended as a client accommodation in light of the circumstances." (*See* Exhibit "D" to the Complaint).

---

1 Defendants each had 30-day notice provisions in their Agreements.

TIAA since has discovered, however, that Falter emailed his personal cell phone number to dozens of TIAA clients, including in December 2020 and January 2021 when he undoubtedly was exploring a move to a competing firm. (*See* Conway Dec. at ¶ 25). By email dated January 27, 2021, less than a month before Falter gave notice of his departure, a TIAA client asked if he should call Falter at his office number, but Falter specifically instructed the client to call his personal cell number which he provided to the TIAA client. (*Id*. at ¶ 26). In two separate emails dated January 30, 2021, Falter wished TIAA clients "Happy New Year!" nearly a full month late and, in these emails, gave the clients his personal cell phone number. (*Id*. at ¶ 27).

Falter knew TIAA policy prohibited him from providing his personal cell phone number to clients. (*Id*. at ¶ 30). In late 2020 or early 2021, Falter's supervisor, upon finding out that Falter had given his personal cell phone number to a TIAA client, reminded Falter he was not supposed to do it. (*Id*. at ¶¶ 28-29). Falter acknowledged knowing it was against TIAA policy. (*Id*. at ¶ 30). Falter, however, failed to disclose to his supervisor that he had provided his personal cell phone number to dozens of additional TIAA clients. (*Id*. at ¶ 31).

By providing TIAA clients with his personal cell phone number, Falter enhanced the odds that they would call him once he was at a competitor and, in turn, move assets to ReFrame. (*Id*. at ¶ 32). One or more clients to whom Falter provided his personal cell phone number in violation of TIAA policy have transferred to ReFrame. (*Id*. at ¶ 33). If TIAA clients called Falter on his personal cell phone number, he also would have both their name and phone number in his "Received Calls" and/or "Voicemails." (*Id*. at ¶ 34). The Agreement defines Confidential Information to include, without limitation, the identities and phone numbers of TIAA clients. (*See* Exhibit "A" to the Complaint at ¶ 1).

In its March 18, 2021 correspondence, TIAA demanded that Falter purge all Confidential Information as defined by the Agreement "from any computers and/or portable devices including, without limitation, the phone numbers of TIAA clients on your personal cell phone." (*See* Exhibit "C" to the Complaint). While Falter's counsel claimed he has no TIAA confidential information in his possession, no express assurances ever have been provided that Falter purged all client identities and phone numbers from his personal cell phone and TIAA believes Falter still retains Confidential Information in violation of the Agreement. (*See* Complaint at ¶ 41).

Prior to giving notice of his resignation, Falter also was overheard telling individuals, including TIAA believes clients, that he was "frustrated" and/or "overwhelmed." (*See* Declaration of Caroline Huber (hereafter the "Huber Dec." at ¶ 16). Falter's comments laid the groundwork for TIAA clients to follow him to ReFrame. At the time he resigned, Falter also was Facebook friends with over a dozen TIAA clients. (*See* Conway Dec. at ¶ 39). In updating his job status on Facebook in early April 2021, Falter said he and others at ReFrame would be honest advocates, clearly implying this could not be the case at TIAA. (*Id*. at ¶ 40). Following this posting, multiple TIAA clients who were Facebook friends with Falter moved their assets to ReFrame. (*Id*. at ¶ 41).

Falter is continuing to solicit TIAA clients. (*Id*. at ¶ 42). In fact, according to a TIAA client, in September 2021, Falter said her new TIAA Associate Wealth Management Advisor ("AWMA") was "overwhelmed" and it would "help" the new AWMA if she (the TIAA client) moved to ReFrame. (*See* Huber Dec. at ¶ 4). When the TIAA client asked Falter if she should reach out to her new TIAA AWMA, Falter said no and that he "had been in contact." (*Id*.). TIAA believes Falter told the client not to reach out to TIAA because the client would have discovered Falter was lying when he claimed it would "help" if she moved her assets to

ReFrame. (*See* Complaint at ¶ 50). The client transferred her assets to ReFrame. (*See* Conway Dec. at ¶ 45).

Doll also has reached out to at least one TIAA client since her departure who then transferred assets to her at ReFrame. (*Id.* at ¶ 46). By correspondence dated August 2, 2021, Doll's counsel denied that she had breached the Agreement and claimed she "has, to date, abided by the Agreement's terms, and intends to continue doing so." (*See* Exhibit "E" to the Complaint). Doll's counsel, however, despite the provision in Doll's Agreement providing that TIAA "shall be entitled to expedited discovery without the need for a court order authorizing such discovery…," refused to identify the TIAA clients with whom Doll had initiated contact, stating "there is not, as far as I can determine, a contractual, statutory, or common law basis for this request…" (*Id.*).

Doll's counsel also tried to justify the refusal to provide this information on "duties of confidentiality she cannot breach." (*Id.*). No such duties of confidentiality exist. (*See* Conway Dec. at ¶ 51). To the contrary, TIAA knows the identities of its own clients and simply was asking Doll to identify any TIAA clients she reached out to in breach of the Agreement. (*Id.* at ¶ 52).

By correspondence dated August 8, 2021, TIAA reiterated its demand that Doll identify all TIAA clients she has contacted since resigning. (*See* Exhibit "F" to the Complaint). In its correspondence, TIAA pointed out the existence of the expedited discovery provision in Doll's Agreement. (*Id.*). Nevertheless, to date, Doll refuses to identify any of the other TIAA clients she has contacted. (*See* Conway Dec. at ¶ 55). Based on Doll's admission that she reached out to at least one TIAA client, who then moved assets to ReFrame after meeting twice with Doll, and Doll's ongoing refusal to identify any other clients she contacted and/or deny having done

6

so, TIAA believes Doll has solicited multiple TIAA clients in violation of her Agreement. (*See* Complaint at ¶ 63).

Defendants also have become authorized parties on at least 20 TIAA clients' accounts since joining ReFrame. (*See* Conway Dec. at ¶ 56). Being an authorized party allows Defendants to have access to all information relating to the TIAA client's accounts. (*Id*. at ¶ 57). Authorized parties typically are individuals assisting the clients in connection with their TIAA accounts, such as family members or attorneys, not financial advisors working for other firms who can use it as a vehicle to compete against TIAA. (*Id*. at ¶ 58). In addition, it gives Defendants the ability to have a purported reason to continue communicating with TIAA clients during their one-year non-solicitation period. (*Id*. at ¶ 59).

TIAA believes Defendants reached out to one or more TIAA clients about being an authorized party on their accounts. Numerous clients for whom Defendants acted as authorized parties, including several multi-million dollar relationships, have transferred their assets to ReFrame. (*Id*. at ¶ 60).

Thus far, Defendants have diverted over $63 million in client assets to ReFrame. (*Id*. at ¶ 61). Based on Defendants' conduct to date, Defendants have solicited and/or intend to solicit TIAA clients to transfer to ReFrame and violate their other obligations to TIAA.

**B.**  **TIAA IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Atl. Diving Supply v. Moses*, 2014 U.S. Dist. LEXIS 105364, at *14 (E.D. Va. July 31, 2014) (*quoting*

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). TIAA satisfies all these requirements.

    1.    **TIAA Has A Likelihood of Success on the Merits**

TIAA has clear right to relief under the Agreement. The Agreement contains a New York choice-of-law provision. (*See* Exhibits "A" – "B" to the Complaint at ¶ 9 and ¶ 10, respectively). The Agreement is enforceable under New York law and, in fact, New York courts routinely enforce much broader and more restrictive covenants. *See*, *e.g.*, *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999) (Second Circuit upheld a non-compete provision); *BDO Seidman v. Hirschberg*, 712 N.E.2d 1220 (N.Y. 1999) (Court of Appeals upheld 18-month prohibition on servicing clients of former employer).

In *Merrill Lynch v. Rahn*, 73 F.Supp.2d 425, 429 (S.D.N.Y. 1999), the court upheld the non-solicitation and confidentiality covenants of another securities firm, noting such relief has been "consistently granted." In *Pace Securities v. Pollack*, 550 N.Y.S.2d 299, 300 (N.Y. App. Div. 1990), the New York Appellate Division described a very similar contract as "narrowly drawn to prevent defendants from reaping the fruits of their improper conduct, while still allowing them to compete freely in the marketplace." *See also Leake v. Merrill Lynch*, 623 N.Y.S.2d 220, 221 (1st Dept. 1995) (appellate court reversed the trial court for failing to grant a preliminary injunction in a similar case, holding "the trial court erred by not entertaining, and granting, Merrill Lynch's application for a preliminary injunction due to … the prejudice which would flow from denying this relief.").

Under New York (and Virginia) law, advising clients of one's new employment at a competing financial services firm constitutes improper solicitation. *See*, *e.g.*, *Alliance Capital Management L.P. v. McCool*, 2004 N.Y. Mics. LEXIS 3260 at *8 (N.Y. Sup. Ct. 2004)

("Additionally, this court is unpersuaded by respondent's argument that the sending of announcements to customers notifying them of his new job at Merrill Lynch is not a form of solicitation of these customers, a solicitation which he agreed not to engage in when he became an employee of Alliance."); *U.S. Trust Company, N.A. v. MacLachlan*, 2008 N.Y. Misc. LEXIS 7748 at *8 (N.Y. Sup. Ct. 2008) ("Contacting former clients to advise them of one's new business contact information constitutes solicitation."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Radulovic*, No. 04cv1329 (E.D. Va. 2004) (where departing broker argued that his phone calls to clients were not solicitations to clients, court held that "nor is it plausible to argue, as defendant does, that calls to these clients were merely courtesy calls and not an attempt to solicit business. Such an argument flies in the face of reality and common sense.") (*See* Exhibit "A").

Importantly, simply because a client may reach out to Defendants does not "open the door" to solicitation. *See, e.g., FCE Benefit Administrators, Inc. v. George Washington University*, 209 F. Supp.2d 232, 239 (D.D.C. 2002) (concluding improper solicitation occurred, the court held: "Even though she was initially contacted by Melwood [the client] and asked to provide rates for HMO plans, she assumed an active role in Melwood's decision-making process."); *Corporate Techs., Inc. v. Hartnett*, 731 F.3d 6, 12 (1st Cir. 2013) ("we believe that the better view holds that the identity of the party making the initial contact is just one factor among many that the trial court should consider" in determining if solicitation occurred); *Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp.2d 1089, 1111 (D. Colo. 2016) ("conduct may fall within the definition of 'solicit' and 'solicitation' even in the absence of Defendants making the initial contact with Wells Fargo's client or customer."); *Wachovia Ins. Servs. v. Hinds*, 2007 U.S. Dist. LEXIS 82103 at *20 (D. Md. Aug. 31, 2007) ("[w]aiting for clients to call and then actively trading on the services provided by a previous employer do not remove Hinds's activity from the

scope of the non-solicitation agreement."); *Legal Tech. Grp. v. Mukerji*, 2019 U.S. Dist. LEXIS 97011 at *29 (D.D.C. May 13, 2019) (the court found that "the plain meaning of 'solicit' does not necessarily require the soliciting party to initiate contact.").2 Defendants are soliciting TIAA clients by *affirmatively reaching out to them*, and Falter is misleading clients in the process.

Although the Agreement is governed by New York law, Virginia courts likewise routinely grant injunctive relief upholding non-solicitation and confidentiality covenants. *See, e.g., Radulovic*, *supra*; *TechINT Sols. Grp., LLC v. Sasnett*, 2019 U.S. Dist. LEXIS 173231 (W.D. Va. October 7, 2019) (upholding two year non-solicitation and "non-service" agreement); *New River Media Group, Inc. v Knighton,* 245 Va. 367, 429 S.E.2d 25 (1993) (reversing finding that 12 month non-compete was unenforceable); *Blue Ridge Anesthesia and Critical Care, Inc. v. Gidick*, 239 Va. 369, 389 S.E.2d 467 (1990) (reversing denial of injunctive relief and finding enforceable 3 year non-compete).

Sufficient consideration also exists for the Agreement. In New York, continued at-will employment is sufficient consideration. *See Zellner v. Conrad*, 589 N.Y.S.2d 903, 906 (1992). The same is true under Virginia law. *See, e.g., Management Concepts v. Kraemer,* 2004 Va. Cir. LEXIS 391. at *8-9 (2004).

Even in the absence of an express contract, injunctive relief is appropriate to protect TIAA's confidential and proprietary information. *See, e.g., Physicians Interactive v. Lathian Systems Inc.*, 2003 U.S. Dist. LEXIS 22868 at *23-25 (E.D. Va. 2003); *National Legal Research Group v. Lathan*, 1993 U.S. Dist. LEXIS 6681 at *22-26 (W.D. Va. 1993). Indeed, courts

---

2 *Mona Elec. Group, Inc. v. Truland Serv. Corp.*, 56 Fed. Appx. 108 (4th Cir. 2003), is distinguishable in that the contracts appear not to have barred solicitation where the contact was initiated by the clients. Defendants' Agreements do, in contrast. (*See* Exhibits "A" – "B" to the Complaint at ¶2(c)and ¶ 2(a)(v), respectively).

throughout the country have accorded trade secret status to the client lists of financial services firms. *See, e.g., Merrill Lynch v. Ran*, 67 F. Supp.2d 764, 775 (E.D. Mich. 1999) ("Merrill Lynch is entitled to trade secret protection under Michigan's Uniform Trade Secrets Act"); *Merrill Lynch v. Cross*, 1998 WL 122780 at *2 (N.D. Ill. 1998) ("Customer lists are entitled to trade secret protection under Illinois law."); *IDS Life Ins. Co. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994) ("Additionally, § 2(d) of the Illinois Trade Secrets Act, ILCS 1065/2(d), protects IDS's interest in the confidential information such as customer identity, addresses, and financial data… An injunction is therefore appropriate to protect IDS's proprietary interest in these trade secrets and to prevent the secrets from being disclosed to competitors or unjustly used by Smithson for his own benefit.").

In addition, courts in New York, Virginia and elsewhere consistently enforce non-disparagement provisions similar to that contained in Defendants' Agreement. *See, e.g., Grand v. Schwarz*, 2018 U.S. Dist. LEXIS 51923 at *15 (S.D.N.Y. March 27, 2018) ("Section 8 of the Settlement Order prohibits Grand from 'badmouthing' or 'disparaging' Schwarz, orally or in writing. There is nothing ambiguous about that language."); *Shire LLC v. Mickle*, 2011 U.S. Dist. LEXIS 24453, at *13-14 (W.D. Va. March 10, 2011) (denying motion to dismiss contract claim based on alleged violations of a non-disparagement provision); *see also Blackwell v. Sportech, Inc.*, 2021 Conn. Super. LEXIS 243 (Conn. Super. Ct. March 1, 2021) (court upheld settlement agreement including non-disparagement provision); *Svanaco, Inc. v. Brand*, 2021 U.S. Dist. LEXIS 115059 (N.D. Ill. June 20, 2021); *Biles v. John H. Schneider & Medport*, 2020 U.S. Dist. LEXIS 257376 at *30 (D. Wy. Sept. 10, 2020) ("In sum, the non-disparagement clause is enforceable, there is no material fact that Schneider and Medport violated it, and that he (and Medport) should be permanently enjoined from further violations of that clause.").

Falter also violated his fiduciary duty/duty of loyalty. It is black letter law that an employee "owes a fiduciary duty of loyalty to his employer during his employment." *Alliance Tech. Group, LLC v. Achieve, LLC*, 2013 U.S. Dist. LEXIS 4708, at *13 (E.D. Va. January 11, 2013) (citation omitted). A plaintiff may claim a breach by alleging that the employee "misappropriated trade secrets, misused confidential information, [or] solicited an employer's clients or other employees prior to termination of employment." *Id.* (citation omitted). Furthermore, a "[r]esignation or termination does not automatically free [an] employee from his or her fiduciary obligations," and a "former employee may breach his duty to a former employer if the conduct began during employment or if post-termination competition is founded on information gained during the [employment] relationship." *Id.* at *14 (citation omitted). In this case, Falter violated TIAA policy by providing dozens of TIAA clients with his personal cell phone number, allowing those clients ready access to him once he joined ReFrame and/or giving Falter their confidential information on his personal device.

In short, TIAA has a likelihood of success.

**2.   TIAA Has No Adequate Remedy At Law**

TIAA has no adequate remedy at law and will suffer irreparable harm in the absence of injunctive relief. *See, e.g., Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) (in granting preliminary injunction, the Court held: "Although it may be easy to calculate the amount of harm caused with respect to a single transaction between defendant and a client, the Fourth Circuit has repeatedly recognized that '[t]he threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm.'" (*citing Multi Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co*., 22 F.3d 546, 552 (4th Cir. 1994). In *Radulovic*, this Court held that "the record amply reflects the risk of immediate irreparable

12

harm to Merrill Lynch in the event a restraining order does not issue. In that event, defendant might continue to call and solicit Merrill Lynch customers he formerly dealt with for the purpose of soliciting their accounts." (*See* Exhibit "A" at pp. 1-2).

TIAA will suffer irreparable harm on multiple levels if an injunction is not granted. First, damages are difficult to ascertain. In *Merrill Lynch v. Stidham*, 658 F.2d 1098, 1102 (5th Cir. 1981), the Fifth Circuit held: "The injury here is such that damages could not adequately compensate. Were respondents permitted by the law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. How such a figure could be arrived at escapes us." *See also Merrill Lynch v. Salvano,* 999 F.2d 211, 215 (7th Cir. 1993) (Seventh Circuit held that the soliciting of clients "sufficiently supports the court's determinations regarding irreparable harm and the inadequacy of Merrill Lynch's legal remedy.").

Second, injunctive relief is necessary to protect the stability of TIAA and to discourage similarly-situated employees from violating their obligations. *See Merrill Lynch v. Patinkin*, 1991 U.S. Dist. LEXIS 6220 at *20 (N.D. Ill. May 9, 1991) ("The Court believes that the denial of the extension of the TRO under the circumstances presented in this case would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm petitioner faces, on several levels, is enormous.").

Furthermore, as emphasized at the outset, Defendants *expressly agreed* to preliminary injunctive relief. In *Ticor,* 173 F.2d 63, 68-69 (2d Cir. 1999), the Second Circuit held: "[W]e think for several reasons irreparable harm was shown to be present in this case. Initially, it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to

come. In fact, the employment contract sought to be enforced concedes that in the event of Cohen's breach of the post-employment competition, Ticor shall be entitled to injunctive relief, because it would cause irreparable harm." The Second Circuit proceeded to hold: "Such, we think, might arguably be viewed as an *admission* by Cohen that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision." *Id*. at 69 (emphasis added). *See also North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (after concluding the "loss of trade secrets cannot be measured in money damages because a trade secret once lost is, of course, lost forever," the Second Circuit held: "In addition, Haber acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause 'irreparable injury' to North Atlantic.") (*citing Ticor, supra*).

Lastly, TIAA is entitled to injunctive relief enforcing Defendants' non-solicitation covenants for a full one-year period, taking into account their violations to date. Falter's Agreement provides: "The Restricted Period above shall be automatically extended by any period of time that Employee is or has been in breach of any provision of this Paragraph 2, as applicable." (*See* Exhibit "A" to the Complaint at ¶ 2(e)). Doll's Agreement contains a similar provision. (*See* Exhibit "B" to the Complaint at ¶ 2(g)(iii)). New York and Virginia courts consistently enforce these "tolling" provisions. *See, e.g., HMS Holdings Corp. v. Arendt, et al*., 2015 N.Y. Misc. LEXIS 2455 at *15-16 (N.Y. Sup. Ct. July 14, 2015) ("[T]he Court is unpersuaded by Curtin's argument that the Extender Clause is 'unenforceable as a matter of law.'… This argument also runs counter to appellate precedent recognizing the equitable power of the courts to extend the duration of a covenant even without an agreement."); *New York Real Estate Institute, Inc. v. Edelman*, 42 A.D.3d 321, 322 (1st Dep't 2007) ("Where, as here, a party unilaterally breaches an agreement not to compete and the time period during which competition

was precluded has since expired, such time period may be extended for the length of time that the offending party was in violation of the agreement."); *see also JTH Tax, Inc. v. Noor*, 2012 U.S. Dist. LEXIS 138657, at *14-15 (E.D. Va. Sept. 26, 2012) ("In the interest of equity, and to prevent the Defendants from benefitting from their period of non-compliance with the May 11, 2011 Order, the court EXTENDS the non-compete injunction. . . .").

Briefly stated, there is a substantial threat of irreparable injury to TIAA in the absence of a preliminary injunction. TIAA also is entitled to a preliminary injunction based on Defendants' express consent to a preliminary injunction in the Agreement.

### 3. Granting Injunctive Relief Outweighs Denial and Is In the Public Interest

The benefit of injunctive relief to TIAA far outweighs any detriment to Defendants. Defendants deliberately breached their contractual, fiduciary, and other obligations. It bears repeating as well that they will not be precluded from engaging in their chosen profession. *See, e.g., Merrill Lynch, Pierce, Fenner & Smith Inc. v. Kramer*, 1992 U.S. Dist. LEXIS 15474 at *21 (N.D. Ohio 1992) (granting preliminary injunction, court noted "[t]here is nothing in the agreement which prohibits Mr. Kramer from continuing with his occupation as a broker in the securities industry."); *Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 749 F. Supp. 1349, 1355 (N.D. Tex. 1991), *aff'd*., 948 F.2d 1286 (5th Cir. 1991) (granting injunctive relief, the court noted that "[h]ere Ruscitto will be permitted to pursue his current profession and to compete with Merrill Lynch in the very community in which he has long-resided."). As this Court held in *Radulovic*: "[I]f defendant is prohibited from soliciting the Merrill Lynch clients with whom he formerly dealt until the matter is resolved, he will suffer no harm other than the loss of the right

to solicit his former customers, a right that he contractually agreed to give up in his July 1998 employment agreement." (*See* Exhibit "A" at p. 2).

The public interest also weighs strongly in favor of granting an injunction. *See, e.g., Update, Inc., supra,* 311 F. Supp. 3d at 797 ("[T]he public has an interest in protecting the legitimate expectations of parties to a contract, including non-competes."). As one court observed in a similar case, [t]he public has an interest in preventing unfair competition, commercial piracy, . . . and in safeguarding the confidentiality of financial records." *IDS Life Insurance Co. v. Sun America*, 958 F. Supp. 1258, 1282 (N.D. Ill. 1997), *aff'd in part, vac. in part*, 136 F.3d 537 (7th Cir. 1998). "Consequently," the court explained, "the public's interest has been disserved by defendants' actions" because *"[t]he public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior."* *Id.* (emphasis added).

## CONCLUSION

For all of the foregoing reasons, TIAA respectfully requests that its motion for preliminary injunctive relief be granted.

Dated: November 22, 2021

TEACHERS INSURANCE AND
ANNUITY ASSOCIATION OF AMERICA

By: /s/ Amy M. Pocklington
Amy M. Pocklington, Esquire
Virginia State Bar Number 45233
amy.pocklington@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
901 East Byrd Street, Suite 1300
Riverfront Plaza, West Tower
Richmond, VA 23219
Telephone: (804) 663-2330

Fax: (855) 843-1809

Christopher C. Coss, Esquire
(*Admission Pro Hac Pending)*
Thomas J. Momjian, Esquire
(*Admission Pro Hac Pending*)
Coss & Momjian, LLP
111 Presidential Boulevard, Suite 214
Bala Cynwyd, Pa. 19004
(610) 667-6800
(610) 667-6620 (fax)
ccc@cossmomjian.com

*Counsel for Plaintiff*

**Certificate of Service**

I hereby certify that on this 22nd day of November, 2021, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, and I will also serve a copy of this filing on counsel for Defendants by email and overnight mail:

Matthew B. Baum, Esq.
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas – 11th Floor
New York, NY 10105
mbaum@egsllp.com

By: /s/ Amy M. Pocklington
Amy M. Pocklington, Esquire
Virginia State Bar Number 45233
amy.pocklington@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
901 East Byrd Street, Suite 1300
Riverfront Plaza, West Tower
Richmond, VA 23219
Telephone: (804) 663-2330
Fax: (855) 843-1809

49389846.1